I'm Joan Fisher with Mr. Matthews. I represent Maxwell Hoffman. Mr. Hoffman has been before this court before, in which this court remanded the matter for an evidentiary hearing on the issues of ineffective assistance of counsel and on whether or not the failure to provide counsel at the pre-sentence interview was harmless. That evidentiary hearing took place over a period of five days as well as a number of depositions taken in lieu of live testimony. And judge, the district court entered an opinion finding that Mr. Hoffman had in fact been deprived of his right to effective assistance of counsel at the sentencing stage as a result of trial counsel's failure to develop the mental health issues, failure to interview witnesses, including three people who had been involved in the trial. I know that he named one was Mr. Hoffman's mother, but the other two were Debbie Holmes, who was the wife of Richard Holmes, who was one of the major co-defendants, though killed in prison in this case, and Dawn Williams, who was the girlfriend of Mr. Hoffman at the time. The trial court also found that it was ineffective for the trial counsel to have used an evaluation that had been available to trial counsel at the time of sentencing. Notwithstanding his findings of ineffectiveness at sentencing, the judge found that there was no ineffectiveness on the issues of guilt and innocence. There are four specific issues which are raised as items of ineffectiveness. The first is the failure of the, well, the underlying... Idaho doesn't have one of these bifurcated systems like California does. So, tell me how, so how does that all work? At the time that Mr. Hoffman was sentenced to death, we had a bifurcated system because we had judge sentencing. Judge sentencing, yes. So we had the jury trial in March, and then the sentencing was in June of that year. So there was a significant period of time that passed in relation to the two proceedings. Well, now the jury's verdict, the verdict the jury returned, they found guilty of first degree murder and that there was use of a dangerous weapon. That's correct, Your Honor. Okay. Part of the verdict was, that was the verdict, was first degree murder. First degree murder. The substantive evidence against Mr. Hoffman... Did that make him death eligible? It did not make him death eligible. It did not make him death eligible. The death eligibility was... It was a witness. It was killing a witness. It was killing a witness. And it was heinous atrocious and cruel was the second one. There were two aggravating factors found by the trial judge. But the jury made no findings. And when Mr. Hoffman is re-sentenced, he will have the advantage of having a jury determine his sentence, because at this stage of the proceedings, Mr. Hoffman is at risk of facing another death penalty. And I guess we can ask the state, but if the state decides not to re-sentence, would his default sentence be life without parole? I think not, Your Honor, because the way the statute is set up, there has to be a jury finding of those aggravating factors before there's a default sentencing. I see. And so we would still have to have a jury finding of aggravating factors. Even to get life without parole? Right. To get life without parole. Otherwise, he would have the potential of getting life with the possibility of parole on just the jury verdict at this point. Without a finding of the aggravators. Okay. That's correct, Your Honor. The ineffectiveness of counsel at guilt and innocence, issues that are raised here, are four. One is the failure of the defense counsel to develop and prepare and present a cogent theory of defense regarding the ability of Mr. Hoffman to actually intend, the consequent intent to commit murder, or to meet that specific intent of first-degree murder. The trial court, and all of the four issues of ineffectiveness, rise out of the single failure of the trial counsel to develop the mental health issues. His failure to secure mental health experts and develop those issues give rise to all four of the issues. So the basic fact finding of deficient performance for failure to secure the mental health experts. That's on that diminished capacity issue. That's one of the issues, Your Honor. Can you run through those real quick? Just one, two, three, four. The four areas are diminished capacity or lack of intent, the failure to be learned in the law and advise appropriately on the plea bargain, the failure to develop and challenge the competency of Mr. Hoffman at the time of trial, and the last is the failure to properly investigate and develop the issues of actual innocence. Now, when you go through on competency at the time of trial, you mean mental health, is he competent to stand trial? That is correct, Your Honor. In Idaho, there's a two-pronged system which follows the constitutional minimum, namely that the defendant has to understand the proceedings. No, and the fourth one again, what you said. The fourth is the failure to develop the factual innocence. Okay, okay. But the competency to stand trial, that doesn't take much to satisfy that requirement. Well, and that is, I believe. You have to know what's going on and be able to talk to your lawyer. Correct. But part of that knowing what's going on and talking to your lawyer actually engages more than just talking to your lawyer but having some sense of what is happening. Well, didn't he tell his lawyer what had happened and what his role in it was? The lawyers believed that he did, and there was a conversation to that effect. One of the difficulties in Mr. Hoffman's mental health issues is that he suffers from psychosis due to an injury or malformation of the brain and also due to long-term substance abuse. As a result of that, his reality is different than others, and as trial counsel testified at the evidentiary hearing, they realized very early that he didn't actually understand the proceedings, that he really couldn't wrap his brain around what they were trying to say, and that the details, that they didn't ever ask him specifically what the details of the offense were, but in fact they gave him the details. And then they would ask him to sort of fill in blanks. And that well before trial, maybe at least three weeks, three, four weeks? No, I think it was like three to one week, one to three weeks before trial, Mr. Coulter said he became clearly aware, because he would begin to test Mr. Hoffman, that Mr. Hoffman didn't understand them, and he was simply agreeing with whatever it is they said and that he would parrot what they said. Let me go with you this far. That is to say, for purposes of my question, or perhaps questions, assume that it is ineffective assistance of counsel not to have performed mental and psychological testing on Mr. Hoffman. And if they had done that testing, they would have got the same result that we now see in the testimony in front of the district judge on habeas. That is to say, low IQ, hovering somewhere in the low 70s, almost organic inability to read, if that's the right way to say it, psychosis, some of it coming out of drug, I'll just take all of that. What does the trial counsel then do with that? What I'm after is harmlessness. What's the trial strategy once the trial counsel knows that? Well, what he does, one, is he does in fact challenge, should challenge the competency. And I'm not after competency to stand trial. That's a separate question. I'm assuming for the moment that he's competent to stand trial, and I'm really after your mens rea defense is what's at least, that's your heading at least. But once you know that, and let's assume we have a ruling from the trial judge that you've got to live with that he's competent to stand trial, you're now going to trial with that information. What do you do? You develop the diminished capacity defense, and you challenge the state's ability to meet the burden of proof on the mens rea. Well, I understand that, but try the case for me. I've read the transcripts. I mean, I know what testimony was put on. I know the evidence that was in there against him, which is a fair amount. And so how do you deal with that? Well, the fair amount of testimony that was presented against Mr. Hoffman rested primarily on two people, on the statement of Richard Holmes, who brings him into it in the first place, because he was never an original suspect in this case, and then Ronnie Wages, who testifies that Hoffman does the acts that Max later admits to doing at that sentencing hearing. What you do is you present the expert testimony. You present the lay testimony that we presented of Deborah Holmes, of Don Williams, of Ron Wages, as to the extent of the drug abuse, and to the actual ingestion and injection of methamphetamine and cocaine at the time of the offense, so that even assuming that Ron Wages is telling the truth, or was telling the truth because he now has recanted, was telling the truth at the time, you then present to the jury the fact that Mr. Hoffman's ability to form the intent is simply not there. Now, the judge found that it was a strategic decision not to do that because of the jury pool in Owyhee County, because they weren't inclined towards mental health-type defenses. But Mr. Coulter and Mr. Wellman never said that. They never said it was a decision, a strategic decision. They said we didn't do it because we didn't have time, because we were overwhelmed, because we were doing something else. And what they were doing was going to trial without a defense, and that's essentially what happened. So the argument, and the testimony, and then the argument that goes to the jury, once Hoffman's lawyers know this, let me just make sure, I'm trying to try the case from a Hoffman standpoint with this knowledge, is we've got this evidence against him primarily from wages. Now, Holmes talks about what led up to it, but the evidence as to what actually happened up there in the ravine is really wages testimony. Only wages testimony. Well, it's not quite only wages testimony. We have the later testimony from Williams and from Honeycutt and from Gezzi in terms of what Hoffman told him while in prison, but it's primarily based upon wages. We have that testimony, and what do you do? Do you say, well, yes, he did slit her throat, but he didn't know what he was doing? In truth, that's what you have to do. You have to present Dr. Marikangas, you have to present Dr. Pablo Stewart, and you have to present Dr. Nell Riley, and you have to reach out to the jury and educate them on his psychosis. And that is a better chance of succeeding than the strategy actually adopted, which is to say he didn't do it. That is to say the strategy actually adopted was to say wages did all of the cutting, and the evidence they have for that is partly sort of omission, that is to say, well, you know, all we have is wages testimony and then these irresponsible, unreliable jailhouse niches. Plus, we've got the two people, I forget her name now, but there were two people presented on rebuttal, both of whom said, well, I heard wages say that he did it. So you're abandoning that strategy, and you think your strategy has a better chance? Well, I'm not abandoning that strategy. Well, I think you're choosing one or the other. Either he did it or he didn't. Or are you? I don't think that I have to choose that, because on the basis of his mental health, he could have done it and he wouldn't have had the intent. He may not have done it, and he wouldn't have the ability to defend himself against the accusations of wrong wages. What you're really saying is that if all that information were before the jury, that the burden of proving the intent element is still on the state, right? That's correct, Your Honor. So you put all that in, and given that evidence, that the state would have had a difficult job of showing intent to kill. I think there would clearly have been a reasonable doubt as to Max Hoffman's ability. Well, look, could you really expect a jury to buy that he cuts the woman's throat thinking it's going to protect her? Yes, I could, Your Honor. Who could believe it? But you're saying with this expert testimony, you expect the jury to accept that there's a reasonable doubt that when he cut her throat, he wasn't trying to hurt her, he was trying to protect her from the other guy. That's correct. Is that correct? That is correct, Your Honor. And I understand. There's one judge here who doesn't really think that flies. And the reason you don't think that flies, Your Honor. Explain to me why a jury could believe that. I will. If you had heard the live testimony at the evidentiary hearing, it makes sense to one person, Max Hoffman, but it makes sense to Max Hoffman that that was the only plan, assuming he found himself in a place he didn't want to be, which is what he said. It makes sense for him to try to get out of it by pretending to go along with those who are stronger, meaner, and have power over him, and yet not actually engage in the act of killing. It would make sense, if you heard the testimony regarding Max Hoffman, not only of the experts regarding the psychosis and his inability, his lack of being rooted to reality. It was like Nell Riley, who saw him go into a psychotic episode. It was like Nell Riley, who said, you can talk to him, talk to him, talk to him, and what he says doesn't make sense, but to him, it makes sense. And this is where the... What bothers me about your argument is that, I mean, I understand what the expert testimony is, but it's hard for me to accept or to believe that a jury in any county, anywhere, would believe that someone who's well enough that the judge permits them to be in court for a trial could be so psychotic they could actually believe they're helping someone by cutting their throat. I believe that a case could have been made, and I understand your hesitation to adopt that because of the bizarre nature of it, but the testimony regarding the bizarre nature of Mr. Hoffman's thinking is undisputed. He does not think the way you and I think. He may speak words that are close to the words that we speak, though not the same, but he cannot grasp what the logic or the illogic of his position. And I think that that is shown relatively clearly by the fact that Judge Windmill initially, through a colloquy with Mr. Hoffman, believed that Mr. Hoffman was competent to dismiss his appeals. That upon a second visit with Mr. Hoffman, where Mr. Hoffman literally appealed the granting of his own motion, the judge realized that even though he appears to be partaking in a conversation, he doesn't understand what he's saying. His thought process is in a whole different dimension than yours, than yours, than mine, than the jury's. And I think with the fact witnesses of Don Williams and Debbie Holmes about his mental retardation and the limits that that creates, and then you add to that the psychosis and his inability to actually think things out the way we think things out. There was compelling fact testimony beyond the experts that would lead you to believe not only that Max Hoffman did in fact believe what he was saying, that he did in fact do that, that he thought he was helping Denise Williams. It turned out that he didn't cut her throat. Correct. He did not fatally. Well, he did not fatally. She was able to get out of that cave and start clambering up the hill. Correct. If he had cut her throat, she probably, you know. He would not have. And it was not the cause of death, and it was a nonfatal wound initially. Now, whether or not it would have led to death is a whole different situation. Let me ask a different version, but I'm still on the same question, and that is. No, go ahead. I'm sorry, Judge Gould. Go ahead. You go ahead. It's hard for me sometimes to hear you starting. Go ahead. What I wanted to clarify was, is the prejudice issue, whether the failure to present this testimony and defense to the jury, undermines our confidence in the verdict of guilt, whether it had a substantial injurious effect on the verdict? Is that what we have to ask? Yes. I'm sorry. Or is it a reasonable probability of impact on the verdict, like the second prong of Strickland? Of Strickland. Well, to tell you the truth, I'm not sure. I think the first is Brecht, isn't it? The judge used the second prong of Strickland to determine whether or not there was prejudice as a result. But the judge's use of prejudice, finding of prejudice, was different because he based it solely on the belief that a particular jury in rural Idaho would be unable to accept the defense. Let me ask you this, if I can. We're so far, for the last little bit, we're proceeding down the track of, well, if Hoffman had presented or Hoffman's lawyers had presented to the jury the theory that Hoffman thought he was protecting her by cutting her throat in the cave, how can you do that with that level of detail and still keep the other alternative defense, he didn't do it? I mean, at some point, if you're at that level of detail, I think you have to abandon the he didn't do it version. Is that right? I mean, he didn't do it or I'm going to invent you a very elaborate story with sort of, here's what he was thinking and so on. I mean, I don't think you can do both. If you're at that level of detail, I think you've got to choose. Well, there is a difference between whether he, there is this other part of him, which goes to his fierce loyalty and his willingness to be scapegoated by these much smarter, much meaner people. I understand. So, I think that you're right. The level of detail of how he attaches to this theory, you know, to this sense that I wasn't trying to kill her. But that could also be he's accepted the burden that Mr. Holmes and Mr. Wages have placed on him, which is to talk to a murder that he did not commit, that he did not even participate in. Okay. So, you're still saying that it would have been a rational defense strategy to say I didn't do it, Wages did everything, but if I did it, I was down there in the cave trying to protect her and I cut her throat and then told her to stay there. You want to present both of those simultaneously to the jury? I'm not sure that I do, Judge. I am sure that as trial counsel, I want to know everything about both of those defenses before I decide. Oh, I understand that perfectly, and I agree with you. But I'm after, okay, once you know, then what do you do? And if you go with the second one, that is to say he was in the cave, he cut her only to protect her, I'm assuming that the kidnapping of Ricky Simon comes in. Is that going to be true? Oh, yes, yes. And the testimony surrounding that is he holds Simoness so the others can hit him. Is that right? As I recall, and this is one of the areas where the trial judge did not, I mean, the district court did not let us put in the affidavit of Mr. Simoness, but the evidence is actually that Wages did. Wages and Holmes committed the Simoness kidnapping. So that would have been another element to fully investigate before you decided the option that you were going to take. Clearly, you have to look at all of his prior convictions. But what I'm after is I think the evidence of, is it Simoness, I'm not sure how to pronounce it, Ricky Simoness, Simoness, that Hoffman participated in that kidnapping as well. And was there evidence that during that kidnapping that he held Simoness so that the others could hit him? Is that true? My recollection of Debbie Holmes' testimony was that she was present at the time and that that is not true. Not true, okay. That Mr. Hoffman was not involved in that and that she personally witnessed it. Not even present? That he was present at the home, just as Debbie Holmes was, but that he was not, he did not participate in the offense in any way. Okay. And I believe that Mr. Simoness supports that in an affidavit that the district court did not let us. The other issue, which I think is clearly an effectiveness, is the attitude. Can I ask you a couple quick questions? Sure. Was there a limit placed on the amount of money that could be spent to hire an expert? We've seen cases where the judges said, all right, you want to get an expert, a psychiatrist and all that, okay, $250. Anything like that here? There was no limit placed on it because trial counsel never asked and that was where the district court found deficient performance. The district court believed that the attorneys would not get much. There was a psychiatrist report. That psychiatrist was at sentencing, not pretrial. Oh, that was at sentencing. And when they did ask, based on that psychologist's report, for more money to investigate the mental health issues, the judge said no. But that was at the post-conviction proceeding. So that was very late and it was too late. Did the judge have that psychiatrist report at sentencing? No. The judge did not have the psychologist's report at sentencing. So how much did they get for that? How much money was allocated for that? I actually don't know, Your Honor. Was there a limit placed on that? There is no order limiting the amount. What they did was they appointed Mr. Simoness. Was there any limit placed on the amount of the defense counsel's compensation? Yes. But I'm not sure that it's part of the record. But there was, as I understand it, the agreement was a flat fee for representation. And he did not seek additional money? He did not. Could have but did not? Could have but did not. And testified that he believed that had he properly researched it and presented it to Judge Wesson, Judge Wesson would have followed along and permitted him to pursue the defenses that he failed to pursue. In some of these places, it's not unusual where, okay, you're going to defend a murder case. Flat fee, $1,000. Did they have flat fees? You know, it depends on the county. And my recollection on the compensation was that Mr. Wellman had a public defender contract, which was limited, and he didn't get additional. It was a low-bid contract, and he didn't get additional compensation. I'm not sure what Mr. Coulter got, but he was not appointed until three weeks before trial. And then on post-conviction, he got a flat fee of $5,000. What they do is a shortage of state public defenders or county public defenders. So people bid, and they're out in some remote area where there's not that much business or whatever. So they say, well, I'll act as a public defender for so much money a year. That's correct. They do? That's correct. And at that time in Idaho, there was not any exception for capital cases. There is now an exception for capital cases, so there's some state funding for the defense of capital cases. How does this Atkins case cut across? Well, the Atkins case cuts across in many interesting ways, one being that all of those fears that the United States Supreme Court point to for their reasons for finding that it would violate the Eighth Amendment to execute a mentally retarded person, their vulnerability to false confessions, their vulnerability to being scapegoated, their vulnerability to being dominated, their vulnerability to not being able to defend themselves and not being able to articulate their defenses are all present. And when coupled with the psychosis, create a critical issue which should, in fact, merit Mr. Hoffman a new trial. That's merit one. Mr. Hoffman a new trial. Thank you. May I please report Lamont Anderson appearing on behalf of the respondent, A.J. Harvey. May I ask you a question? Absolutely, Your Honor. So let's say it comes up for resentencing. Does the state press for the death penalty? Your Honor, that's not a decision that I get to make or my office gets to make. The local prosecutor makes that decision and ultimately that's going to be made by them. We have made recommendations to the local prosecutor and, in fact, our office during the course of Mr. Hoffman's trial helped them. But that prosecutor from our office is no longer there. And quite honestly and candidly, I'm not sure what our office's involvement is going to be in the resentencing of Mr. Hoffman. But my understanding is yes. I'm sorry, Your Honor. You did not appeal the determination on the sentencing case, correct? Actually, Your Honor, we did appeal, but then we moved to withdraw our appeal on the sentencing issues, which was granted by this court. So the only issue before this court is the ineffective assistance of counsel at trial. There are no sentencing issues before this court today. When I said you didn't appeal, I mean you don't have an appeal of that now. No, we do not, Your Honor. But just to make sure that I've pinned down your answer to Judge Pergerson's question, you're not able to give us much of an idea as to what would likely happen if we leave the conviction intact and allow resentencing to go forward? I can't tell you definitively that, Your Honor. Now, I heard the word definitively. Can you give me a hint? I know that our office has recommended that we go forward to seek the death penalty. We have a number of hoops that we have to jump through in Idaho to do that. And number one would be the Acton's issue. That's impressive. Hi, who? Well, I don't know that it is, Your Honor. Based on the evidence that was presented at the evidentiary hearing, I think it's a pretty close issue on the issue on the question of mental retardation. But that does have to be decided before we can even go forward with the sentencing. I mean, his IQ, Judge Fletcher said, hovers around the low 70s, you know. About 74, Your Honor. 72. Or 67. Or 67. We've got all those numbers. Yeah, we've got all kinds of numbers in there, all the way up to the high 70s. And those are issues that are questions of fact that are going to have to be determined by the trial court. Ultimately, if the conviction is affirmed, there will have to be some pleadings filed indicating the mental retardation before the trial court. And there will be a hearing held before the trial court. And if there's a determination that there's mental retardation, then we can't ask for the death penalty. The most that we can expect if we can't ask for the death penalty will be fixed life. However, we can't, the jury does not have to determine a statutory aggravator in this case to get that. What I mean by that is that I know that counsel alluded to the fact that Idaho law has been changed because of Green, where if a jury finds an aggravating factor but does not, but finds that the mitigation outweighs the aggravation, it's fixed life. That's not going to be the case in Mr. Hoffman's situation because the jury determination of an aggravator for an automatic fixed life was passed after Mr. Hoffman's conviction. It would be an ex post facto problem. Well, I see. So you don't think you have to go back to the jury to get yourself a life without parole? In fact, we can't, Your Honor. So your view, the default position, if you do not seek resentencing, the default position is life without parole? Actually, the default is life with a minimum of 10. In other words, if... Oh, and that would have been even then? Yeah, it would be the same as what it was back in 1986. I see. And we're well beyond the minimum of 10, I guess. I would hope so, Your Honor. The only thing I was thinking about was that you've got a lot of problems here, and you've got Atkins, and it's unconstitutional to execute a mentally retarded person, and you read the transcript, particularly the sentencing, and the way he seems to garble things up, and the IQ, and the drugs, and the brain injury, and all the rest of it. Just, did you ever work out something where you say, well, he stays in prison the rest of his life, but he takes off in death row? Well, and again, Your Honor, I recognize the evidence that was presented at the evidentiary hearing, which is, at least in some part, why we decided to withdraw our appeal. Don't they make work out an agreement on something like this? It's possible, Your Honor. I just don't know that that will be done. Again, I'm not the one that makes that determination all the time. Well, I mean, has it been tried here? I believe there were some preliminary discussions. Mr. Hoffman's attorney, he presently has an Atkins post-conviction petition pending before the trial court, and I believe that was Mr. Dennis Benjamin, and I believe some calls were made to a colleague of mine, and where those calls went, I don't know. I'm talking about now, with his counsel who's not present. Well, and again, Your Honor, I can't make those determinations. The local prosecutor has to do that. This sounds like deja vu all over again. Mr. Anderson appeared before me in Seattle on Wednesday of last week in a capital case, and at the conclusion of argument, we suggest to the parties that they consider the possibility of mediation and report back to us, if I recall, within 10 days or two weeks. Yes, Your Honor. Here we are again. Yes, Your Honor, and I can tell you what I did was contact the local prosecutor, and I asked the local prosecutor, are you interested in this, and he has responded yes. A letter went out from counsel yesterday in that particular case. That's a different case, Judge Ferguson, and Judge Gould. The problem is that in Idaho, the Attorney General's Office, we actually tried at one time a number of years ago to, my words, march into the local counties and tell the prosecutors what to do, and the Idaho Supreme Court said you can't do that. You don't have authority to do that under Idaho's Constitution. Here's my problem with the case in general, and then I'll get down to sort of the legal detail. You've got a number of bad actors here. First, you've got those two, I'll call them boys, Slauson and Longstreet, who seem to have been young but in full possession of all of their faculties. They delivered Denise knowing darn well what's about to happen to her. You've got Holmes, who seems to be the ringleader, who is arranging for this and maybe even paying for this. We've got Wages, who is in full possession of his faculties, or at least maybe I shouldn't say that. We've got serious drug addiction by both Wages and Holmes, but he seems to be confident, certainly more confident than Mr. Hoffman. He seems to be the moving force. He's out there when Denise is delivered. He's the one who sort of goes through this masquerade of having the two boys take off her clothes, tie her up with their shoelaces, and so on. And then you come to Mr. Hoffman. He's the weakling. He's the man with, and everybody knows that he's got an inability to read. Everybody knows that he has a low IQ and that he's easily led and so on. So what's the state do or may the prosecutor do? A terrible, terribly sweet, sweetheart deal for the two boys. A very sweetheart deal for Mr. Holmes, although he suffers for it because they think he's a snitch. Actually, Your Honor, there was no deal with Mr. Holmes. Well, there was one coming. Well, okay. We could tell there was one coming. And then we get life in prison on a deal for Wages. So out of those five, who have you got the death penalty against? The weakling. And again, Your Honor, based upon the mitigation that was presented at the evidentiary hearing and the cases from this court on the issue of mitigation and investigation in the United States Supreme Court, that's why we withdrew our appeal on the sentencing. I see. Mr. Hoffman should be resentenced, but I am not the one that makes that decision as far as plea negotiations or otherwise. Okay. So that's my overview of where we are. But let me get down into the fine grain. It seems to me, and here speaking only for myself, the strongest argument that Mr. Hoffman's lawyers have now, to my mind, is the one that I've been focusing on, and that is the possibility of diminished capacity and the ability to form the mens rea. I think there's a fairly decent argument that he couldn't form the mens rea. What's your response to Mr. Hoffman's counsel's scenario to how this might have played out? Do you contend that this really is not a sufficient probability of a different outcome? Not at all, Your Honor. Tell me why. In fact, what I see, if I might analogize it, as I was flying down from Boise yesterday, there was an article in there about Terrell Owens and Donovan McNabb, and the fact that Terrell Owens is going to have an arbitration hearing today regarding his reinstatement with the Philadelphia Eagles. And I thought, you know, four weeks ago or three weeks ago when they suspended Terrell Owens from the Philadelphia Eagles, I wonder if they knew that Donovan McNabb was going to go down with an injury. Well, of course they didn't. And the rub between Terrell Owens and Donovan McNabb, that's why Terrell was ultimately suspended. I don't know any of those names. I thought you were talking about prisoners. Well, what we have here, Your Honor. Keep talking. I know these guys imminently. Terrell Owens is a nutcase.  He fits in well with this case, doesn't he, Judge? The bottom line here is that the people of Philadelphia are probably going, why didn't we get rid of arguably the best wide receiver in the NFL? Particularly now that Donovan McNabb, with whom Terrell Owens was having problems and was really the rub, he's now out for the season. And what we have here is we didn't know that Donovan McNabb was going to go down with an injury, and we have classic Monday morning quarterbacking. And that's what we have in this case. Because there was a defense that was established. It was to place blame on Ron Wages. That was the defense. That was a really good lead-up to an old cliché. Well, I tried. I tried, Your Honor. We had a defense. These two lawyers, particularly Mr. Wellman, came up with a defense, and in fact put on witnesses on their behalf. They attacked Ron Wages' credibility. They brought in an expert, Loring Beals, who said this guy was so, well, actually he didn't specifically say Wages was. He said when you're taking the amount of drugs that these folks were, Wages, you're not going to remember things that went on. And they specifically attacked Ron Wages again and again and again. They brought in witnesses that attacked the credibility of, I believe it was Williams, and said, Williams is a no-good liar. You can't believe a thing that he says. And that was to attack the confessions or the admissions that Hoffman had made to people with whom he was in jail. They put on a very good defense. No, it was kind of a lousy defense. They said nothing about Hunnicutt. They said nothing about Gezzi. Their attack on Williams was ineffective. I mean, I saw them do it, but it didn't work very well, and I have to say I found the Beals testimony quite unconvincing. That's what they tried to do. My difference with you is that it was good. And that may be, Your Honor, you know, we got convicted. You know, I guess that's the ultimate. But that isn't the test. The test is, did they spend sufficient time investigating and have enough information to make a tactical decision regarding the defense that they did choose? Oh, you see there, I just totally disagree with you. That is to say, they didn't have enough information because they didn't develop the alternative information that would have let them know how strong the argument was as to his mental retardation and psychosis. But that doesn't mean you lose. It just means that, okay, assuming that I decide that it's a violation of the standard of care, well then, is it harmless? Well, and I just don't see how you can present these two defenses at the same time. And that's what you have. What is the standard on harmlessness that applies in this case? Your Honor, it's the Strickland standard. Is there a reasonable probability? I'm sorry, Your Honor? The second prong of Strickland. Yes, Your Honor. Is there a reasonable probability that the outcome of the verdict would have been different? And in this case, I don't see how. And particularly, you have Mr. Wellman's testimony, and respectfully I disagree with counsel regarding Mr. Wellman's discussion of an Owyhee County jail. Mr. Wellman basically said that there was no way that a jury in Owyhee County, with farmers and ranchers were his phrase, were going to buy a diminished capacity defense. It just wasn't going to happen in this case. And in fact, the jury actually had some evidence. Maybe there should have been a change of venue, huh? Well, Your Honor, just because a jury isn't going to buy a defense in a particular county isn't a basis for a change of jury. It's whether the jury can't make a decision based upon the infirmary. Maybe it sounds like maybe he can't get a fair trial in that county. Well, respectfully... If that is only, you know, if his defense is that I didn't have the mental capacity to form the intent, and he puts that evidence on, and then the state has got to prove beyond a reasonable doubt that he had the specific intent, and you're in a place where nobody's going to buy it. So if you're a defense lawyer, wouldn't you want to get out of that place? Your Honor, respectfully... I mean, they do that in Texas all the time. Well, Idaho is a pretty rural state with lots of farmers and ranchers. And respectfully, although it wasn't raised, it isn't evidence, I would submit that nowhere in the state of Idaho would the defense that Hoffman is now propounding to present to the jury would be bought, particularly based upon the evidence that was presented to the jury. What you have here is a situation where wrong wages comes in. I mean, what happened to that? Remember the shooting case that took place with the alcohol, tobacco, and firearms? And, you know, those folks were holed up in a mountain? Ruby Ridge. Ruby Ridge. What happened to Ruby Ridge? That wasn't a diminished capacity defense, Your Honor. No, but what happened? It was an acquittal. It was an acquittal. Why was there an acquittal? I honestly don't know, Your Honor. I wasn't there. You had a good lawyer with a cowboy hat on, you know. You know, the fellow from Wyoming. Oh, okay. So, you know, a lot depends on how things are presented. Well, I don't disagree with you, Your Honor. The problem that I have is... You get a verdict. You think about it. A verdict. You've got the federal agents who are shooting. They've got these bad people up there at Ruby Ridge who are shooting back at them. And when you get acquittals, it's kind of surprising. Actually, I don't think anybody was surprised by that verdict, Your Honor, in Idaho. I'll tell you something. I was. Not in Idaho, Your Honor. I was sitting as a district judge by designation at the time because, you know, I was kind of relieving some folks up there. But when we look, Your Honor, at the facts of this case, we have Ron Wages who comes in, admittedly a bad guy, and testifies for the state and tells the jury what happened. That he wasn't even present when Hoffman takes Denise down into the ravine and splits her throat. But because he's in a truck and he goes and turns around and comes back, Hoffman's coming out of the ravine on one side, Denise is on the other. And then they go over to the other side of the ravine where Denise is at and they throw rocks at her and crush her skull. You have Teresa Page. Well, no, they do more than that. Of course, they go back down in. According to Wages' own story, he then takes the knife from Hoffman, stabs her in the side, and then throw rocks at her. Evidence, I think, is pretty consistent between Wages and, in the end, Hoffman, that it was probably Wages' rock or rocks that killed her. And, Your Honor, we don't know one way or the other. Certainly the expert that testified regarding the autopsy was not able to state, and we don't know who's rock. It's certainly conceivable. But we also have Teresa Page's testimony regarding statements that Wages made. We have Anthony Mercer, who was called to impeach Williams' testimony that was presented by the defense. I mentioned Lauren Beals. We have Mike Vickery, who testified to rebut Wages' statements about cutting. But we have a lot of testimony to support Wages' story also. We have Longstreet and Slauson. We have Williams, Honeycutt, and Gezzi. We have Martin Garza, who saw Hoffman and Wages coming to the house in a jeep, park, and wash the blood from the jeep. We have St. Martin, who saw Hoffman burning clothes. Martin's testimony is corroborated by Jamie. The bottom line on this is, yes, we got a bad guy who was the state's chief witness, Ron Lazen. But his testimony is repeatedly corroborated over and over and over again. And I just don't understand how Hoffman's testimony at sentencing, where he basically corroborates Wages' story, establishes a diminished defense. And particularly when you consider that during the post-conviction, I believe it was post-conviction, excuse me, it was a sentencing hearing, Hoffman said, hey, I knew what was going on at the time. I wasn't hallucinating, even though I was using drugs. Yeah, but I don't think we get to consider that for part of this question. The reason he's testifying at the sentencing stage is probably because of a constitutional violation. I don't think that evidence is properly in front of us in terms of reconstructing what was supposed to happen at the trial. Well, I don't know about that, Your Honor, because certainly, as I recall at least, the district court in this case actually compared Hoffman's testimony with what was testified to by Wages. And my recollection is correct in determining whether there was prejudice or not. Well, but I'm not about to do that. That is to say, if I'm talking ineffective assistance of counsel, what I'm looking at is what would a good counsel, excuse me, a constitutionally sufficient counsel have done. And a constitutionally sufficient counsel, I'm willing to say, would have done the investigation and would have had in front of him or her the evidence of retardation and so on. Then the question is what would that lawyer have done with it and were long before any possibility of testifying at a penalty phase. That shows up later, but that does not enter into my analysis of what should have happened at trial with competent counsel. And I understand that, Your Honor, except with respect to the fact that both Wellman and Coulter testified that the information that they had from Max Hoffman was the same information that he testified to at sentencing, although Mr. Coulter specifically said that there was even more information that Hoffman had given him, other than what was presented at the time. No, I'm totally with you except that as I'm trying to reconstruct the trial strategy that Wellman and Coulter would have arrived at had they known, had they had the evidence of retardation and so on in front of them, well, they don't have to put Hoffman on the stand. I mean, they might or might not. No, I understand that, Your Honor. All I'm saying is that for purposes of determining what Wellman and Coulter knew from Hoffman, that's when we need to look at his testimony at sentencing, because they testified at the evidentiary hearing that his testimony at the sentencing hearing was consistent with what he had told them prior to trial. That's all I'm saying. Well, that's all you're saying, fine, but that doesn't tell us what they were going to put on in front of the jury. Well, based upon the information that they had from him, we know what they presented to the jury. They didn't have the information they really needed, you know, to make a competent decision. But, Your Honor, in making that decision, they have to rely upon the information from their client. Well, how can they do that if their client is, you know, he's hovering around that area and there are other indications that, you know, he was totally all there. The problem that I have with that, Your Honor, is that there really wasn't that much information before those two lawyers. What they had was an individual who could not read and write. That is not incompetency. That is not diminished capacity. They had an individual who had a... Counsel... I'm sorry, Your Honor. Counsel, how do you answer Appellant's argument that before they could make a strategic decision not to present diminished capacity, they must have done the investigation, which they didn't pursue here? Yes, Your Honor, and I was trying to get to that, Your Honor. What the information was regarding... that would lead them to pursue a potential diminished capacity defense was their interaction with Hoffman. They knew that he could fill in the blanks. He had a limited intellectual capacity, but that was based upon his speech. He talked in street jargon. He had difficulty in communicating, but that was based upon his literacy limitations. What I'm trying to convey to the Court is that they really didn't have any information that would lead a reasonable attorney to even pursue a diminished capacity defense or to investigate men in retardation. They knew he was taking all these drugs, didn't they? They knew that he was taking drugs, yes, Your Honor. But what I'm saying is, based upon the detailed stories that Hoffman had been giving them, the drugs didn't affect his ability to know what was going on at the time. In fact, Coulter specifically said that Max Hoffman was filling in the blanks when it came to them talking about what had happened. Coulter would go to him and say, you know, this is what I understand the situation to be. And Hoffman would fill in the blanks of things that he didn't know. Now, if you have a diminished capacity defense, I don't know, I don't understand, if you're not right up here and can't form intent, how you can fill in the blanks regarding a murder of this nature. I have a real, real problem with that. Based upon the information that they had before them, while there was – What blank did he fill in to refresh my memory? Well, actually, Your Honor, Mr. Coulter was unable to articulate specific instances of filling in the blanks during the evidentiary hearing. But he specifically said Max Hoffman would fill in the blanks and would explain those gaps. If you look in the context of Mr. Coulter's testimony – Give one example. He did not give an example, Your Honor. He would fill in the gaps of the story that Mr. Coulter knew. Mr. Coulter came in three weeks before trial. Mr. Coulter was trying to investigate and find out what the story was. And Hoffman filled in the blanks for him, told him what was going on. I don't know, when you have that level of detail regarding the murder, how you can have a diminished capacity defense. The notion that you feed Max Hoffman information and he can then regurgitate that weeks or even months later actually supports the State's position that he wasn't incompetent and that he didn't have a diminished capacity at that time. Normal people that have those type of mental problems are not going to be able to remember things from their lawyer. Well, they don't know all that. How do you know all that? That's in the record. I mean, we don't know all that. You get people that have got real problems of mental capacity and they can, you know, play Mozart, you know, beautifully. You know, there are lots of old jokes about the punchline, which always is, you know, the smart guy on the outside of the entire cell looks at somebody who's just displayed some mental acuity and says, how come you're there? And the crazy guy says, well, I'm crazy, but I'm not stupid. It turns out Mr. Hoffman is slow and he may also have been psychotic. Maybe. Maybe. But is there a reasonable probability that the outcome of this verdict would have been different if a diminished capacity was maintained? That's the soft spot for me. I'm willing to go along and say, okay, mental capacity was severely diminished partly just by nature and partly by drugs. And then I'm trying to figure out, okay, assuming that, what's the harm? And that's what I'm on. I'll just tell you, I'm kind of on the edge with that question. But it could have. I mean, that jury had choices, right? First degree murder, second degree murder. What were the other choices? Your Honor, I'm trying to recall. Oh, manslaughter. And the verdict itself. I'm trying to recall if there were included offenses given to the jury or not, and I just don't recall. Well, in terms of the verdict form, oh, yes, second degree murder. It's just right there. They have to. It's constitutionally required. And I looked at the verdict form, and, yes, it's there. And I would assume so. But, again, I just couldn't remember. But I do think that that supports the State's theory or the State's argument that there isn't a reasonable probability. They put out a different case. They've resolved it in second degree manslaughter. Certainly that could have been done, Your Honor. But is there a reasonable probability? Is there a reasonable probability that had all this been put on that the verdict of the jury may have come back with a verdict of second degree murder? And I would submit, Your Honor, no, there's not a reasonable probability of that. Why not? As I stated earlier, the overwhelming nature of the evidence in this case that was presented to the jury establishes that there was intent. Intent in Idaho requires simply a showing of malice and intent to kill. And the jury was already aware of the fact. Well, that's specific intent. Yes, it is, Your Honor. That is specific intent, Your Honor. And the jury was certainly aware, at least as I recall the record, that Hoffman had left Denise down in the cave having slit her throat, and that she came up, and that it was Ron Wages and Hoffman who then threw the rocks, which ultimately was the cause of death. I realize there was the stabbing also. And I see my time is up, Your Honor. Are there other questions I might be able to answer? We've got lots of time. Well, if there are other questions, Your Honor, I'd be happy to address them. Judge Gould, anything further? Nothing further here. Thank you very much. Thank you very much. The State would ask that the District Judge be affirmed. Thank you, Your Honor. Thank you. Thank you, Your Honor. In the District Court's decision at page 12, the District Court found that counsel were aware of Hoffman's significant mental deficits, including his inability to read and write, and his difficulty communicating and comprehending information. So by the District Court's finding, counsel was familiar with that. The thing about the diminished capacity is that it wasn't a strategy. And to say that it was a strategy is to mischaracterize the record. Mr. Wellman said, yes, at one time I said the jury pool was a concern, and so there must be a grain of truth to that. But in truth, I was distracted with other matters. So he didn't make a reasonable decision not to pursue it. In fact, it makes no sense because he did present Mr. Beal. He did present and say his defense was to get this jury to believe that Ron Wages didn't know what he was doing, that Ron Wages couldn't remember what had occurred, and yet he doesn't develop that same strategy on behalf of a client that he knows has difficulty comprehending information, that he knows something's wrong with, but he hasn't taken the time or asked the court for the money to develop that issue. Diminished capacity is a defense that would reduce the degree of the offense. The total lack of intent would be a not guilty, but diminished capacity as a defense would reduce it from first to second degree. And at that stage, especially in light of the many shortcomings of Mr. Hoffman, had the jury been aware of all that, it is reasonable to assume that they would have at the very least come back with a lesser included verdict. The other issue on the issue of the death penalty, and I know that we have not discussed it, and I just want to take a few minutes, is the request by the defendant that you specifically enforce the plea bargain because counsel misadvised him as to the state of the law. And so they all say that Mr. Hoffman would have taken that plea. Now, I have questions that he would have to be made competent to make that decision, but everyone admits that Mr. Hoffman simply followed his attorney's advice and had his attorney properly advised him that it was questionable. Yes, you know, the Ninth Circuit had said the Idaho statute or had said that Arizona was unconstitutional, but it was clear that Adamson had not yet become final. It was clear that the state of Idaho was litigating whether or not they would follow Adamson, and it was clear that Arizona had rejected it all at the time that Mr. Hoffman's attorney should, you know, all those things Mr. Hoffman's attorney should have been taking into consideration when he advised Mr. Hoffman on that plea. It's not that he misread Adamson itself. Correct. He should have had some serious doubts about whether or not, I mean, it doesn't happen very often that we get reversed, but maybe we might have been, and Adamson, that's the idea? That's correct, Your Honor. And not that it doesn't happen, that he should have known it wasn't the final decision. That's all he had to say is, you know, death is still on the table until that decision becomes final. All it takes is a cert denied. Well, it was pending cert, and he should have known that, and he should have told Mr. Hoffman, you know what, Max, you're facing the death penalty. This may be the time to think about taking it off the table, and then we don't have to worry about whether it goes all the way to the top. We don't discuss that, but that's a different issue. What is the result if we were to affirm the guilt conviction but enforce the plea agreement? It would be a life sentence. Death would be off the table. And was that offer a life sentence with no possibility of parole? No. It was just that they would take death off the table, so that's all that the plea agreement included. So it could be, you know, I suppose in 86, I'm not sure if a fixed life was available. I think a fixed life was available. So the state could certainly argue at a resentencing in front of a judge for fixed life, and the defense could argue for life with the possibility of parole. Okay. Thank you. Would it be out of order to ask the state if it has the same response in terms of if the plea bargain were to be enforced? I have no objection to that. Your Honor, my understanding in researching this issue as to if the conviction were to be reversed, my, and admittedly it's not in depth, but my recollection is that it would, if it were based upon the plea agreement, the plea agreement would have to be enforced. That's my recollection. But, no, I'm asking what does it mean to enforce it? Does that mean life without possibility of parole, or does it mean life with possibility of parole? No, Your Honor, my understanding of the plea agreement was simply life, and it could be indeterminate life with only a 10-year minimum. Could be, but could it also have been life without parole? Again, unlike counsel, yes, I believe so. In 86, I believe we had the Unified Sentencing Act, I believe, had been enacted by then. So the short answer is you're a little uncertain, both of you are just a little uncertain on the point. Yes, Your Honor. Thank you. Thank you. All right. Do we want to go to the mediator on this? You need a few days to think about whether you want to go to the mediator on this? Yes, Your Honor. I have one difficulty, and that's the issue of competency. But if we could render him competent, I think that mediation would be in the best interest. If you could render what? Mr. Hoffman competent. You mean to stand trial? To accept the plea. Or to accept the result of the mediation. Or to accept the plea. Oh. Okay. I think, I don't know, I was looking for it, but I think we have a case where that issue came up a number of years ago, involving finding of competence to stand trial and how that related, I thought, to a plea. But... Your Honor, I think that we would certainly, you know, try to find it. It's a case that I was involved in, but I haven't been able to locate it. I haven't spent that much time on it. The other judge involved in that case was Judge Noonan, as I recall. But... There's some gap in my memory. All right. What was on the other end, whether it was involved in sentencing guidelines or taking of a plea, I'm not sure. But I haven't, I thought about this late last night, about 11 o'clock, so I haven't had a chance to look that up. So, what are we going to do? Are you going to let us know? Your Honor, as I said at the beginning, I'm not the one that makes those declarations. And if the court isn't inclined to do as was done in Mr. Lankford's case last week, what I do is go back to the office, I tell that to my immediate supervisor, and then I call the local prosecutor. I ask the prosecutor, are you interested in this? If, in fact, it will be the Attorney General's office that ultimately ends up with the case instead of the local prosecutor, and if very well may, then I will go to the Chief of the Prosecutorial Assistance Unit, and ultimately it will go to the Attorney General of Idaho, who will make the decision as to whether the state would be willing to mediate the case. The short answer, Your Honor, is I can certainly inquire the respective parties, and we can let the court know the holiday by the end of next week. Yeah, well, I always think it's a good idea to go to the mediator, so I'd encourage you to do that, both sides. That's up to you. So, whatever it's worth. Thank you, Your Honor. Okay. You going back today? Yes, Your Honor. Should we advise the court? What? Should we advise the court in writing regarding the agreement, whether or not we're going to do it? Oh, yeah, sure, yeah. Yeah, well, when do you want to do it? Should we set a deadline, or a six-month total withdrawal, or what? I'm joking. I didn't even know. I didn't know what that was. Your Honor. That's all they're talking about. I'm not in favor of any withdrawal, but there's a lot of talk about it. Your Honor, considering the holiday. I'm a stay-in-the-course man. If we could have, and I don't know what the date is, but a week from Friday, I could get up. Yeah, okay. I think I could get ahold of the parties by then. All right. Yeah. Hawaii County, as I've said, is a very rural county, and I don't – last I heard, our profits here in Hawaii County had been run over by a car as a victim in an aggravated battery, and it's not doing well. So that's why I'm wondering if the Attorney General's office ultimately will be – Oh, I see. He just had one – He is not – Just one prosecutor there? A part-time prosecutor, Your Honor. Oh, part-time prosecutor. Yes. Yes. He's in. Okay. It's a very, very – largest geographical area in the county of Idaho, but one of the very smallest populations. Where is it with relation to Boise? North? Southwest. Northwest? No. Southwest. A little bit southwest down towards Nevada. Towards Nevada. Towards Nevada and north. And it contains the famous road, Cow Creek Road. Yes, Your Honor. I remember that place. Yeah. Yeah. Good place to fish. Yeah. All right. They'll call it Creek to this. Creek. Well, that's where they talk, yeah. That's where they talk in Montana, anyway. All right. We'll see you later. And we'll recess. Court is adjourned.
judges: Pregerson, W. Fletcher, Gould